**Roger JEFFERSON, Petitioner,**

**v.**

**Darwin LaCLAIR, Superintendent, Franklin Correctional Facility, and Andrew Cuomo, Attorney General of New York, Respondents.**

No. 09–CV–2782.

United States District Court, E.D. New York.

Signed March 5, 2014.

Filed March 6, 2014.

David Crow, The Legal Aid Society, Jonathan K. Youngwood, Simpson Thacher & Bartlett, New York, NY, for Petitioner.

Morrie I. Kleinbart, Staten Island, NY, for Respondents.

### MEMORANDUM AND ORDER

WILLIAM F. KUNTZ, II, District Judge.

Before the Court is a petition for the writ of habeas corpus pursuant to 28 U.S.C. § 2254 by Petitioner Roger Jefferson ("Petitioner"). After a jury trial in New York State Supreme Court, Richmond County, Petitioner was convicted of Criminal Possession of a Weapon in the Third Degree and Criminal Trespass in the Third Degree. After exhausting his state court remedies, Petitioner brought this action in the Eastern District of New York on June 30, 2009. The Court referred the petition to Chief Magistrate Judge Steven Gold on March 12, 2013 and received a Report and Recommendation on May 8, 2013. After *de novo* review, the Report and Recommendation is adopted in its entirety and the petition for the writ of habeas corpus is denied.

### I. LEGAL STANDARD

To the extent a party makes specific and timely written objections to a magistrate judge's Report and Recommendation, the district court must review *de novo* "those portions of the report ... to which objection is made." 28 U.S.C. § 636(b)(1)(C); *see also* Fed.R.Civ.P. 72(b)(3). A proper objection requires reference to a specific portion of the Report and Recommendation. *Pall Corp. v. Entegris, Inc.*, 249 F.R.D. 48, 51 (E.D.N.Y. 2008) (Seybert, J.) (quoting *Barratt v. Joie*, No. 96–CV–324, 2002 WL 335014, at *1 (S.D.N.Y. Mar. 4, 2002)). If a party "makes only conclusory or general objections, or simply reiterates his original arguments, the Court reviews the Report and Recommendation only for clear error." *Barratt*, 2002 WL 335014, at *1 (Swain, J.) (citations omitted). Furthermore, even during *de novo* review, the Court will "ordinarily refuse to consider arguments, case law and/or evidentiary material which could have been, but [were] not, presented to the magistrate judge in the first instance." *Kennedy v. Adamo*, No. 02–CV–1776, 2006 WL 3704784, at *1 (E.D.N.Y. Sept. 1, 2006) (Vitaliano, J.) (citation and internal quotation marks omitted). Upon review, "[t]he district judge may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions." Fed.R.Civ.P. 72(b)(3).

A federal habeas court may only consider whether a person is in custody pursuant to a state court judgment in violation of the United States Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a). The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") requires federal courts to ap-

ply a "highly deferential standard" when conducting habeas corpus review of state court decisions. *Renico v. Lett,* 559 U.S. 766, 773, 130 S.Ct. 1855, 176 L.Ed.2d 678 (2010). A petitioner is entitled to habeas corpus relief if he can show the state court decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States[.]" 28 U.S.C. § 2254(d)(1). The Supreme Court has explained that "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Williams v. Taylor,* 529 U.S. 362, 410, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (opinion of Stevens, J.) (emphasis in original). "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411, 120 S.Ct. 1495. Instead, the state court's application of federal constitutional principles must be "objectively unreasonable" to warrant issuance of the writ. *Id.* at 409, 120 S.Ct. 1495. "This distinction creates a substantially higher threshold for obtaining relief than *de novo* review." *Renico,* 559 U.S. at 773, 130 S.Ct. 1855 (quoting *Schriro v. Landrigan,* 550 U.S. 465, 473, 127 S.Ct. 1933, 167 L.Ed.2d 836 (2007)). As the federal habeas court, we review the Appellate Division, Second Department's decision denying Petitioner's claims of constitutional error in light of these principles.

## II. APPLICATION

The relevant factual and procedural background of this case is set forth in the Report and Recommendation of Chief Magistrate Judge Gold ("the Report"). (Dkt. No. 18, Report & Recommendation ("R & R") (May 8, 2013).) In his objections to the Report, (Dkt. No. 20, Objection to Report and Recommendation

("Pet's Obj.") (June 26, 2013)), Petitioner argues that:

- the Report is based on a fundamental misreading of controlling case law and the record, which demonstrate that Petitioner was "compelled" to wear a prejudicial prison jumpsuit on the first day of jury selection, (Pet.'s Obj. at 14–17);

- the Report erroneously found that any compulsion was nonetheless harmless error, (Pet.'s Obj. at 18–22);

- the Report should have concluded that defense counsel's failure to object to Petitioner's prison garb until the conclusion of the first day of jury selection was objectively unreasonable under prevailing criminal defense norms, (Pet.'s Obj. at 22–24); and

- the Report erroneously found that any potential ineffective assistance by defense counsel was not prejudicial to the defendant, (Pet.'s Obj. at 25).

### *Petitioner Was Not Compelled to Wear His Prison Uniform*

Petitioner's first objection is based on a fundamental misreading of controlling case law. Petitioner contends that he was "compelled" to wear his prison garb on the first day of jury selection because he requested to wear his civilian clothing prior to the commencement of the trial and the Department of Corrections denied this request. (Pet's Obj. at 15–16.) According to Petitioner's reading of *Estelle v. Williams,* 425 U.S. 501, 96 S.Ct. 1691, 48 L.Ed.2d 126 (1976), the compulsion requirement is satisfied any time that the defendant objects to the State's conduct prior to or during trial. (Pet's Obj. at 16.)

The case law does not support Petitioner's argument. "[T]he failure to make an objection *to the court* as to being tried in [identifiable prison] clothes, for whatever reason, is sufficient to negate the presence of compulsion necessary to establish a constitutional violation." *Estelle,* 425 U.S. at 512–13, 96 S.Ct. 1691 (emphasis added). The Court's opinion in *Estelle* is clear that in order to establish compulsion, the defendant or his counsel must make an objection "to the trial judge." *Id.* at 509–10, 96 S.Ct. 1691. In *Estelle,* the Defendant "raised the question [of wearing prison garb] with the jail attendant prior to trial" but it was the failure to raise his objection with the trial court that nullified compulsion. *Id.* at 510, 96 S.Ct. 1691. In fact, the general practice of the trial court in *Estelle* was to have criminal defendants tried in prison garments, unless the defendant or his counsel objected *to the trial judge.* *Id.* at 510, 96 S.Ct. 1691. Additionally, the Court clarified that there is no burden on the trial judge to inquire whether the defendant wants to proceed in prison clothing when there is no objection made to the court. *Id.* at 512, 96 S.Ct. 1691.

*Estelle* dictates the same result here. Despite Petitioner's allegation that he objected to the Department of Corrections' insistence that he wear the prison-issued jump suit, (Pet's Obj. at 16–17), the first objection *to the trial court* was not made until the conclusion of the first day of jury selection, (Pet.'s Obj. at 17). *Cf. United States v. Hurtado,* 47 F.3d 577, 581 (2d Cir.1995) (finding compulsion when counsel objected to the trial judge concerning his client's prison attire, but the court nonetheless continued with jury selection). After that objection was raised, Petitioner was permitted to appear in civilian clothing for the remainder of jury selection and the entire trial. Therefore, Petitioner was never compelled to wear his prison uniform under the *Estelle* standard, and Magistrate Judge Gold's holding on compulsion is adopted by the Court. As there was no infringement on Petitioner's right to fair trial, the question of whether Petitioner was prejudiced is irrelevant at this juncture.

### Petitioner Suffered No Prejudice Because Of Counsel's Failure to Object

On the question of whether Petitioner's counsel's performance was deficient because he failed to object to Petitioner's prison attire until the conclusion of the first day of jury selection, the Report concluded that the issue "presents a close question." (R & R at 20.) The Report went on to evaluate whether the attorney's failure to object was prejudicial to Petitioner. (R & R at 20); *see Strickland v. Washington,* 466 U.S. 668, 697, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) (permitting courts to address the question of prejudice first). The Report concluded that because of the repeated references to Jefferson's present incarceration, the strength of the government's case, the inconsistencies between Jefferson's trial and grand jury testimony, and that Jefferson only appeared before the jury in prison garb for one day, he was not prejudiced by his counsel's failure to object. (R & R at 20.) "The prevalence of the references to incarceration in the trial transcript demonstrates that, even if the jurors identified Jefferson's jumpsuit as prison clothing, and even if they remembered that jumpsuit during their deliberations, [P]etitioner would not have been prejudiced because the jurors would have known he was incarcerated by virtue of his own testimony." (R & R at 17.)

The most potent objection raised by Petitioner is that subsequent references by a defendant to his current incarceration can-

not weigh in the prejudice analysis because the impetus for those admissions may have been the original, unlawful appearance in a prison uniform. (Pet.'s Obj. at 20–21, 25) (citing *Gaito v. Brierley,* 485 F.2d 86, 88–90 (3d Cir.1973)). In *Gaito,* the Court of Appeals for the Third Circuit held that there is "no way to know why" a defendant testified about his current incarceration after the jury has already seen him in a prison uniform. 485 F.2d at 90. As the defendant may find no advantage in concealing his incarceration in light of the jury's prior observations, the *Gaito* court found subsequent references by a prisoner to his own incarceration were unpersuasive in the harmless error analysis. *Id.*

■ Nonetheless, Petitioner's reliance on *Gaito* fails here for a number of reasons. First, in the forty years since *Gaito,* the Court of Appeals for the Second Circuit has not adopted this analysis and the Third Circuit's opinion is not binding on this Court. Secondly, Petitioner's references to his own incarceration reflect no strategic attempt to mitigate the jury's prior observation and were made fleetingly, unnecessarily, and often unprompted during cross-examination. (R & R at 16–17.) Lastly, the trial transcript also included frequent references to the Petitioner's prior arrest, conviction for two felonies, and time in prison, often in response to defense counsel's questioning. (R & R at 17) (with citations to the trial record). Petitioner's testimony regarding his prior convictions and jail time further diminish the likelihood of a strategic basis for the post-objection references to his current incarceration.

Even without consideration of the incarceration testimony, Petitioner has failed to "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052 ("A reasonable probability is a probability sufficient to undermine confidence in the outcome."). Petitioner's primary defense at trial was that he was framed by the police, but the persuasiveness of this defense was substantially undermined by the inconsistencies between Petitioner's grand jury and trial testimony. (R & R at 20.) Petitioner's defense was confronted with the generally consistent and credible testimony of three police officers about Petitioner's possession and disposal of a gun. (R & R at 17, 20.) It was not counsel's delayed objection that led to Petitioner's conviction, it was the Petitioner's inconsistent testimony that made his "framing" defense so unbelievable to the jury. The contrast in the quality and consistency of testimony during the trial weighs "heavily against the notion that Jefferson was prejudiced by wearing prison garb on the first day of jury selection." (R & R at 20.)

Moreover, "the length of time [a defendant was in prison attire] is a factor to be considered" when evaluating prejudice. *Hurtado,* 47 F.3d at 582 (finding one day of trial in prison garb was non-prejudicial in light of the evidence of defendant's guilt). Here, Petitioner was only in his prison attire for one day of jury selection. (R & R at 4.) While time is not dispositive, this factor, coupled with the weight of the evidence against the defendant, further demonstrates that Petitioner cannot establish a reasonable probability of acquittal were it not for his initial appearance in the prison jumpsuit.

These considerations are taken in light of AEDPA's mandate imposing a "highly deferential standard for evaluating state-court rulings and demand[ing] that state-court decisions be given the benefit of the doubt." *Renico,* 559 U.S. at 773, 130 S.Ct. 1855 (internal quotations and citations omitted). Under this guiding standard

and our analysis of the record, it cannot be said that the Appellate Division, Second Department's holding that Petitioner was "not denied the effective assistance of counsel" was an unreasonable application of federal law. (R & R at 9.) The Court rejects Petitioner's objections to the Report and adopts Chief Magistrate Judge Gold's holding that the Petitioner was not prejudiced by his attorney's failure to object prior to the end of the first day of jury selection.

## III. CONCLUSION

For the reasons set forth above, the Petitioner's objections are overruled and the Report and Recommendation of Chief Magistrate Judge Gold is adopted in its entirety as the opinion of this Court. Accordingly, the petition for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254, is DENIED. Because Petitioner has not made a substantial showing of the denial of any constitutional right, a certificate of appealability will not be issued. 28 U.S.C. § 2253.

**SO ORDERED.**

*REPORT & RECOMMENDATION*

STEVEN M. GOLD, United States Magistrate Judge.

Roger Jefferson brings this petition for a writ of habeas corpus pursuant to the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254. Jefferson was convicted after trial in Richmond County of Criminal Possession of a Weapon in the Third Degree and Criminal Trespass in the Third Degree, and sentenced to seven years of imprisonment followed by five years of post-release supervision on the weapons charge and a ninety-

day concurrent sentence on the trespassing charge. Habeas Pet. at 1; Pet. Mem. at 1, 10.[1] Jefferson's conviction was affirmed by the Appellate Division, Second Department, and leave to appeal was subsequently denied by the Court of Appeals. *People v. Jefferson,* 58 A.D.3d 753, 870 N.Y.S.2d 804 (2d Dep't 2009); 12 N.Y.3d 784, 879 N.Y.S.2d 61, 906 N.E.2d 1095 (2009).

Jefferson challenges his conviction on the grounds that 1) his right to a fair trial was violated when he was compelled to wear a prison jumpsuit during the first day of jury selection in his criminal case, and 2) he was denied effective assistance of counsel when his criminal trial attorney did not object to Jefferson's prison clothing until the end of the first day of jury selection. Habeas Pet. at 6–8.

By Order of March 12, 2013, the Honorable William F. Kuntz referred this petition to me for report and recommendation. For the reasons stated below, I respectfully recommend that the petition be denied in its entirety.

## BACKGROUND

Jefferson's conviction for criminal possession of a weapon and criminal trespass arose out of a police stop of Jefferson near the Mariner's Harbor Houses Development on Staten Island in the early morning of July 15, 2005. The relevant events that occurred during jury selection and the evidence presented at trial are recounted below.

## I. Jury Selection

Jefferson contends that, on January 11, 2006, the first day of jury selection, he was clad in a Department of Corrections jump-

---

1. "Habeas Pet." refers to the Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus, Docket Entry 1. "Pet. Mem." refers to peti-

tioner's Amended Memorandum of Law in support of his petition, Docket Entry 11.

suit. Habeas Pet. at 6; Resp. Mem. at 10–11. Jefferson further states that, pursuant to his attorney's instructions, he arranged for civilian clothing to be available to him at the jail where he was being held, but corrections officers prevented him from changing before leaving jail for court. Jefferson 440.10 Aff. ¶ 4.[2]

The record is unclear about whether the clothing Jefferson wore on January 11, 2006 would have appeared to be prison issue to the jury. The New York Department of Corrections advised petitioner's counsel that it could not determine whether Mr. Jefferson was wearing civilian or prison clothing when he left jail for court on January 11; however, if Jefferson had been wearing prison clothing, "he would have worn a brown jumpsuit with white 'DOC' lettering on the back." Letter from New York City Department of Corrections dated September 25, 2007, Docket Entry 5–23 at 11. In addition, petitioner's trial counsel, Gregory Clarke, submitted an affirmation in connection with the Jefferson's state court collateral attack on his conviction, asserting that his client's clothing consisted of "a brown, one-piece prison jumpsuit" with "large, contrasting white letters on the back that clearly indicated it was a Department of Corrections jumpsuit." Clarke Affirm. ¶ 4, Docket Entry 5–18 at 25.[3] Petitioner similarly recalls that the "prospective jurors sat behind [him] facing the large 'D.O.C.' letters on the back of the jumpsuit throughout the entire process." Jefferson 440.10 Aff. ¶ 5. In contrast, the trial court judge, reviewing the case during the Section 440.10 proceedings, recalled that Jefferson was wearing "brown coveralls" similar to those worn "by auto mechanics, painters or janitors," and that the coveralls "did not have visible DOC lettering." 440.10 Order at 1 n. 1, Docket Entry 5–22.[4]

It is undisputed that Jefferson's trial counsel did not raise any formal objection, on the record, to petitioner's wearing the jumpsuit prior to the commencement of jury selection. Clarke Affirm. ¶ 4. Although trial counsel contends that he did raise the matter of Jefferson's clothing before proceedings started, he concedes that the record does not reflect that he did so.[5] *Id.* Counsel further asserts that he had no strategic reason for having peti-

---

**2.** "Jefferson 440.10 Aff." refers to Jefferson's affidavit in support of his New York Criminal Procedure Law Section 440.10 motion to vacate his conviction, Docket Entry 5–18 at 29. Both petitioner and respondents have provided court documents relevant to the case's procedural history, petitioner in an appendix of materials made available to the Court in hard copy and respondents by filing the documents electronically on the docket sheet. For ease of reference for those consulting the docket sheet, I will cite to those documents filed electronically by respondents.

**3.** While the trial transcript indicates that petitioner was represented by two attorneys at trial, it seems that only Mr. Clarke was present when the issues regarding Jefferson's prison garb arose.

**4.** In ruling on petitioner's motion for reconsideration of his decision denying relief pursuant to 440.10, the judge found that the evidence put forward by the petitioner did "not change the court's specific recollection" regarding the appearance of the jumpsuit, and denied the motion and declined to grant Jefferson leave to appeal the 440.10 decision. Docket Entry 5–25.

**5.** Of particular significance in light of AEDPA's exhaustion requirement, discussed in the text below, Jefferson did not argue on direct appeal or collateral attack that his trial counsel objected even before jury selection commenced, or that the court responded by refusing to allow Jefferson to obtain and change into civilian clothing. To the contrary, in support of both his 440.10 motion and appeal to the Second Department, Jefferson argued that his counsel erred in failing to object *at all* until the end of the first day of jury selection.

tioner appear before the jury in prison garb. *Id.* ¶ 5.

Counsel did bring Jefferson's clothing to the attention of the court, on the record, at the end of the first day of jury selection, as reflected in the following exchange:

> MR. CLARKE: ... just another minor administerial [*sic* ] matter. Corrections refuses to give [Jefferson] his own clothes to wear to Court and he is forced to wear this state jumpsuit (indicating).
> THE COURT: Why is that?
>
> . . .
>
> CORRECTIONS OFFICER: It is supposedly a new order about the issuance of clothes, because the man is in CPSU, segregation, there are disciplinary charges.
>
> I don't have a copy of that order to give to the Court, but I know that anybody that is in the bink, as we call it, is issued a jumpsuit, stays in that jumpsuit, goes to court in that jumpsuit. That's all I have been told by transportation.
>
> . . .
>
> (Whereupon, an off the record discussion was held at the bench.)
> THE COURT: Corrections says he will be in street clothes tomorrow.

VD Tr. at 181–82.[6] Jefferson appeared in civilian clothing for the second, final day of jury selection and throughout the remainder of the trial. No additional applications were made by Jefferson or his attorney with respect to Jefferson's clothing during the trial.

## II. The Trial

### A. *The People's Case*

During their case-in-chief, the People presented seven witnesses: Police Officers Adam Fiore and Gerard DelPrete and Sergeant Robert Warshefskie, the officers who stopped Jefferson; Detective Joseph Cummings, an expert in firearms identification and examination; Police Officer Joseph Thompson, who prepared the gun recovered from the scene for laboratory testing; Detective Cynthia Ramirez, an expert in identification and comparison of latent fingerprints; and Edward Wallace, an expert in finding, securing and identifying fingerprints.

The three officers present at the scene testified by and large consistently. Their testimony, when considered in combination, related the following facts. At approximately 1:35 in the morning on July 15, 2005, Sergeant Warshefskie and Police Officers Fiore and DelPrete were in an unmarked car in the parking lot adjacent to two buildings in the Mariner's Harbor Houses, 161 Continental Avenue and 264 Lockman Avenue. Tr. at 23–24, 54, 222.[7] The officers saw a man, identified in court as petitioner Jefferson, *id.* at 27, 166, "grab[ ] for something" in his waistband, lift his shirt and expose the butt of a gun, or tuck a gun into his pants, *id.* at 24, 162, 222–23. Seeing the officers, Jefferson ran into 161 Continental with Fiore and Warshefskie in pursuit. *Id.* at 24, 223–24. Fiore chased Jefferson to the roof of 161 Continental where, from approximately 72 feet away, he saw Jefferson throw a gun onto the roof of the adjoining building, 264 Lockman Avenue, and then run down the stairs of the Lockman Avenue building. *Id.* at 25–26, 44. While this was taking place, Officer DelPrete parked the car in front of 264 Lockman and, when Jefferson came out of the building, DelPrete called out to him. *Id.* at 165–67. Jefferson came

---

**6.** "VD Tr." refers to the transcript of *voir dire* and other proceedings prior to trial, Docket Entries 5–3, 5–4.

**7.** "Tr." refers to the transcript of Jefferson's trial, Docket Entries 5–5 to 5–9.

over to DelPrete and provided DelPrete with identification. *Id.* at 167–68. After examining Jefferson's identification, DelPrete informed Jefferson that he would be issued a summons for trespassing. *Id.* at 168–69.

In the interim, Fiore returned from the roof having recovered Jefferson's gun. *Id.* at 28–29. Fiore later gave the gun to DelPrete, who marked it with his initials. *Id.* at 170–72. The gun was tested and determined to be operable, *id.* at 121, but no latent fingerprints of value were found on the handle after testing, *id.* at 132. Following retrieval of the gun, Jefferson was taken to the precinct and informed there that he would be charged for criminal possession of a weapon. *Id.* at 97.

The prosecution's remaining witnesses testified regarding the process of testing the firearm for fingerprints. This testimony is not summarized here because it is not relevant to the Jefferson's claims.

### B. *The Defense Case*

The petitioner testified in his own defense during trial. In addition, the defense called two other witnesses: Wallace Jefferson, petitioner's brother, and Joseph Augeri, who was held at the precinct in the same cell as Jefferson. Their testimony, taken in aggregate, relates the following series of facts.

On the night of his arrest, Jefferson visited with his brother for approximately five or six hours before leaving between 11:30pm and 12:30am. *Id.* at 338, 342, 346. Wallace Jefferson testified that petitioner did not have a gun in his possession at that time. *Id.* at 342–43. After leaving his brother's residence, petitioner went to visit his friend Fareed, who lives at 161 Continental Avenue. *Id.* at 351. Petitioner testified at trial that he then left that building to go a nearby nightclub. *Id.* at 351–52. This testimony, though, was inconsistent with Jefferson's testimony before the grand jury that he visited his sister, then spent time with a woman named Josie in 161 Continental, and finally left, intending to return to his brother's apartment. *Id.* at 385–86, 389. When confronted with this apparent inconsistency on cross-examination at trial, Jefferson explained that he met with Josie at Fareed's apartment, but did not mention Fareed to the grand jury because he wanted to avoid involving Fareed and his family in his case. *Id.* at 386–87.

Jefferson testified that, as he exited the building at 161 Continental Avenue, he was stopped by police officers in the parking lot. *Id.* at 351–52. Jefferson was wearing a long shirt that did not reveal his waistband, and he did not lift his shirt up. *Id.* at 375–77. Jefferson produced identification and a pocket knife he was carrying to Officer DelPrete while Officer Fiore made a phone call and Sergeant Warshefskie went up to the roof. *Id.* at 352–56, 388–89. The officers then took Jefferson to the precinct, ostensibly to be given a desk appearance ticket for trespassing. *Id.* at 360. Once at the precinct, however, and after spending approximately five hours waiting in a cell, Jefferson learned he was being charged with criminal possession of a weapon. *Id.* at 361. Jefferson also noted that he saw Detective Mary Javis at the precinct talking to the officers who had arrested him. *Id.* at 374–75, 395–96. Javis had investigated Jefferson in connection with a previous weapons charge for which he was prosecuted and acquitted after trial. *Id.* at 364.

While in the precinct, Jefferson was held with Joseph Augeri. Augeri testified at Jefferson's trial as a defense witness, and described being questioned by police officers about whether Jefferson had told him anything about a gun, denying knowing anything about Jefferson having a gun,

and then being returned to the holding cell. *Id.* at 511–13.

### C. *The People's Rebuttal Case*

In rebuttal, in addition to recalling Del-Prete and Warshefskie, the People called Detective Javis. Javis testified that she was working on an unrelated case on the night of July 14 and was not on duty when Jefferson was arrested. *Id.* at 494. Javis further testified that, although she was at the precinct for approximately five minutes on the morning of July 15, she did not speak with any of the officers who had arrested Jefferson and was not even aware of Jefferson's arrest. *Id.* at 495–98.

## PROCEDURAL HISTORY

Following his trial, Jefferson moved to vacate his conviction pursuant to New York's Criminal Procedure Law Section 440.10(1)(h), which authorizes a court to vacate a judgment "obtained in violation of a right of the defendant under the constitution of [New York] or of the United States." *See* 440.10 Notice of Motion, Docket Entry 5–18, at 1. Jefferson's motion was supported by an attorney's affirmation and a memorandum of law, and both asserted that Jefferson was denied due process and deprived of effective assistance because his trial attorney failed to object to his appearance before the jury in prison clothing. Pet. 440.10 Affirm. ¶ 1; Pet. 440.10 Mem. at 1–2, Docket Entry 5–18 at 4, 32–33. The prosecution opposed the motion. Docket Entries 5–19, 5–20.

On August 9, 2007, the trial court denied Jefferson's Section 440.10 motion on the prison garb issue because the direct appeal of Jefferson's conviction had not yet been perfected and because, as noted above, the trial court recalled that, "[i]n any event," "the coveralls worn by defendant did not necessarily disclose [his] inmate status." 440.10 Order, Docket Entry 5–22, at 1. The Court further observed that defendant could not have suffered any prejudice from wearing prison clothes because he volunteered on cross-examination that he had been "remanded" and was "locked up." *Id.* at 2. Jefferson moved for reconsideration of the order, reasserting his due process and ineffective assistance claims, and challenging the court's finding that his clothing did not indicate he was in custody. Docket Entry 5–23. The motion was denied, largely based on the judge's recollection that Jefferson's clothing did not identify him as a prisoner. Docket Entry 5–25. Petitioner next sought leave to appeal the orders denying his motions under Section 440.10 and for reconsideration to the Appellate Division, Second Department. Docket Entry 5–26. This application was also denied. Docket Entry 5–28.[8]

Jefferson subsequently brought a direct appeal to the Appellate Division, Second Department. Jefferson App. Mem. at 1, 27, Docket Entry 5–10 (indicating that notice of appeal was filed on July 28, 2006 and that supporting papers were submitted on April 1, 2008). Jefferson pressed two arguments on direct appeal: that he was denied effective assistance of counsel under the United States and New York constitutions when counsel did not promptly object to his wearing prison clothing in court and that he was he was denied his right to a fair trial by being compelled to wear such clothing. *Id.* at 2. The Second Department affirmed the judgment of the trial court, stating that Jefferson was "not denied the effective assistance of counsel because his counsel did not object to the defendant's appearance in court in prison attire until the end of the first day of jury selection" and that his "remaining conten-

---

**8.** New York Criminal Procedure Law Section 450.15(1) makes clear that 440.10 orders may not be appealed except by permission of the Appellate Division.

tions [were] without merit." Docket Entry 5–13; 58 A.D.3d 753, 870 N.Y.S.2d 804 (2d Dep't 2009) (citing *People v. Turner*, 5 N.Y.3d 476, 806 N.Y.S.2d 154, 840 N.E.2d 123 (2005); *People v. Baldi*, 54 N.Y.2d 137, 444 N.Y.S.2d 893, 429 N.E.2d 400 (1981); *People v. Marshall*, 2 A.D.3d 1157, 768 N.Y.S.2d 703 (3d Dep't 2003)).

On January 28, 2009, Jefferson filed a letter seeking leave to appeal the Second Department's decision to the Court of Appeals. Docket Entry 5–14. Jefferson provided copies of his briefs on direct appeal and a letter informing the then-Acting Chief Judge that he sought "leave to appeal all issues raised in his Appellate Division briefs." *Id.* In a follow-up letter, Jefferson focused primarily on his ineffective assistance claim and the opportunity it provided to the Court of Appeals to apply its precedent concerning the right not to appear in prison garb in the context of an ineffective assistance claim; however, Jefferson also raised the question of whether his fair trial rights were violated by his appearance in prison garb. Leave App.2d at 1, Docket Entry 5–15 (discussing *People v. Roman*, 35 N.Y.2d 978, 365 N.Y.S.2d 527, 324 N.E.2d 885 (1975)); *id.* at 4 (identifying the second topic of the letter as involving "The Fundamental Right To A Fair Trial And Meaningful Representation"). On March 19, 2009, the Court of Appeals denied leave to appeal. Docket Entry 5–17. The instant petition was filed on June 30, 2009.

## AEDPA'S PROCEDURAL REQUIREMENTS AND LEGAL STANDARD

This court's review of Jefferson's petition is governed by AEDPA, 28 U.S.C. § 2254. Before reaching the merits of petitioner's claims, I consider the procedural requirements of AEDPA and the statute's legal standard.

### A. Statute of Limitations

AEDPA requires that a state prisoner file a petition for a writ of habeas corpus within one year of "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review." 28 U.S.C. § 2244(d)(1)(A). The judgment in Jefferson's case became final ninety days after the New York Court of Appeals denied him leave to appeal, the date his time to petition the United States Supreme Court for a writ of certiorari expired. *See* Sup. Ct. R. 13(1) ("a petition for a writ of certiorari to review a judgment ... entered by a state court of last resort ... is timely when it is filed with the Clerk of this Court within ninety days after the entry of the judgment"); *McKinney v. Artuz*, 326 F.3d 87, 96 (2d Cir.2003) (calculating the AEDPA statute of limitations as beginning to run 90 days after a New York state prisoner was denied leave to appeal to the Court of Appeals).

Jefferson's petition was clearly timely filed. The Court of Appeals denied his motion for leave to appeal on March 19, 2009. Habeas Pet. at 3; *see also* Docket Entry 5–17 (Court of Appeals certificate denying leave to appeal). Ninety days later, or on June 17, 2009, Jefferson's time to petition the Supreme Court for a writ of certiorari expired. The instant petition was filed thirteen days later, on June 30, 2009.

### B. Exhaustion

■■■■ Under AEDPA, petitioners for habeas relief who are serving state sentences must first exhaust all available state court remedies. 28 U.S.C. § 2254(b); *Baldwin v. Reese*, 541 U.S. 27, 29, 124 S.Ct. 1347, 158 L.Ed.2d 64 (2004).

State remedies are deemed exhausted when a petitioner has: (i) presented the

federal constitutional claim asserted in the petition to the highest state court (after preserving it as required by state law in the lower courts) and (ii) informed that court (and lower courts) about both the factual and legal bases for the federal claim.

*Ramirez v. Attorney Gen. of New York,* 280 F.3d 87, 94 (2d Cir.2001). In *Baldwin,* the Supreme Court held that "a state prisoner does not 'fairly present' a claim to a state court if that court must read beyond a petition or a brief (or a similar document) that does not alert it to the presence of a federal claim in order to find material ... that does so." 541 U.S. at 32, 124 S.Ct. 1347. While a petitioner need not cite " 'book and verse' of the United States Constitution, [he] may fairly present his federal claim to the state court through," *inter alia,* " 'reliance on pertinent federal cases employing constitutional analysis ... [or an] allegation of a pattern of facts that is well within the mainstream of constitutional litigation.' " *Allison v. Khahaifa,* 2011 WL 3298876, at *6 (E.D.N.Y. Aug. 1, 2011) (quoting *Daye v. Atty. Gen. of the State of N.Y.,* 696 F.2d 186, 194 (2d Cir. 1982)). Where a petitioner argues claims

to the Appellate Division but is denied leave to appeal to the state's highest court, he may still meet the exhaustion requirement if his "leave application 'clearly state[s] that he [is] pressing all of the claims raised in [an] attached [Appellate Division] brief' " *Harris v. Fischer,* 438 Fed.Appx. 11, 13 (2d Cir.2011) (quoting *Jordan v. Lefevre,* 206 F.3d 196, 199 (2d Cir.2000)).

■ Respondents argue that Jefferson failed to exhaust his fair trial claim because his letter to the Honorable Eugene F. Piggott of the Court of Appeals discussed his ineffective assistance claim but not his claim that he was denied a fair trial. Resp. Mem. at 11.[9] I disagree and find that petitioner's fair trial claim was properly exhausted. When petitioner applied to the Court of Appeals for a certificate of leave to appeal, he stated that he was "seek[ing] leave to appeal all the issues raised in his Appellate Division briefs." Docket Entry 5–14. The issues aired in front of the Appellate Division included both the ineffective assistance and fair trial claims.[10] Moreover, Jefferson subsequently submitted a follow-up

---

**9.** "Resp. Mem." refers to the respondents' memorandum in opposition to the habeas petition, Docket Entry 12.

**10.** Respondents are correct that petitioner invoked the Appellate Division's "interest of justice" review because trial counsel did not object in a timely manner and thus failed to preserve the prison garb issue for appeal. Resp. Mem. at 12 (citing N.Y.Crim. Proc. L. § 470.15(3)(c) (stating that a judgment may be modified "[a]s a matter of discretion in the interest of justice")). This posture does not alter the outcome of the exhaustion analysis, however. While a petitioner who relies solely on interest of justice review to appeal an issue is not deemed to have exhausted the related federal constitutional claim, *Witt v. Racette,* 2012 WL 3205177, at *6 (S.D.N.Y. Aug. 7, 2012), this is not the case when, as here, the argument made in the interest of justice "implicate[s] a federal constitutional right," *Fi-*

*gueroa v. New York,* 2008 WL 2465124, at *4 n. 8 (S.D.N.Y. June 18, 2008). In this case, petitioner cited *Williams* and indicated that a federal constitutional right was at stake in his Appellate Division brief.

Had the Appellate Division had found that the claim was procedurally defaulted due to the lack of a timely objection, its finding would have constituted a ruling on an adequate and independent state law ground, barring habeas review. *Green v. Travis,* 414 F.3d 288, 294 (2d Cir.2005) (internal citations omitted). However, the Appellate Division did not state in its opinion that there had been a default, Docket Entry 5–13, and courts are presumed in this circumstance to have ruled on the merits, *Jimenez v. Walker,* 458 F.3d 130, 145 (2d Cir.2006). Finally, the exhaustion question raised by respondent is of no moment in any event, as a court may deny a habeas petition on its merits even when

letter to Judge Piggott. While respondents correctly note that this follow-up letter focuses largely on petitioner's ineffective assistance of counsel claim, it does also discuss his fair trial claim. *See, e.g.,* Leave App.2d at 1 ("[T]his case presents the Court of Appeals an opportunity to reaffirm its ... decision in *People v. Roman,* 35 N.Y.2d 978, 365 N.Y.S.2d 527, 324 N.E.2d 885 (1975)—which established that a defendant's right to a fair trial is violated whenever the People compel him to appear before jurors wearing ... prison garb"); *id.* at 2 ("[B]y reviewing ... the Second Department's decision, this Court would be providing lower courts the guidance necessary to adjudicate this critical issue in a manner that ensures all defendants are afforded a fair trial ..."); *id.* at 6–7 ("[T]he Second Department's decision would allow criminal convictions to stand even though a defendant's fundamental rights to a fair trial and effective representation have been clearly violated"). These references to both claims in Jefferson's follow-up letter to the Court of Appeals indicated that the in-depth discussion of the ineffective assistance claim was to "be considered in addition to, not in lieu of or as a limitation on, the issues raised in counsel's initial letter," *Morgan,* 204 F.3d at 371, and, together with petitioner's first letter, was sufficient to exhaust all available state court remedies.

## C. Legal Standard

■ Pursuant to AEDPA's deferential standard, a federal court may not grant a writ of habeas corpus to a state prisoner on a claim that was adjudicated on the merits in state court

unless the adjudication of the claim (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of

the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); *see also Price v. Vincent,* 538 U.S. 634, 639–40, 123 S.Ct. 1848, 155 L.Ed.2d 877 (2003). Thus, under AEDPA, a federal habeas court may not issue a writ simply because it decides that the state court applied Supreme Court precedent incorrectly. *Price,* 538 U.S. at 641, 123 S.Ct. 1848. Rather,

[u]nder the "contrary to" clause, a federal habeas court may grant the writ [only] if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Williams v. Taylor,* 529 U.S. 362, 412–13, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). In the Second Circuit, it is well-established that "the objectively unreasonable standard of § 2254(d)(1) means that [a] petitioner must identify some increment of incorrectness beyond error in order to obtain habeas relief." *Cotto v. Herbert,* 331 F.3d 217, 248 (2d Cir.2003) (internal quotation marks omitted).

## PETITIONER'S CLAIMS FOR HABEAS RELIEF

### I. Fair Trial Claim

Petitioner argues that the Second Department's rejection of his fair trial claim

state court remedies are unexhausted. 28    U.S.C. § 2254(b)(2).

unreasonably applied the well-established principles articulated in *Estelle v. Williams*, 425 U.S. 501, 96 S.Ct. 1691, 48 L.Ed.2d 126 (1976). Pet. Mem. at 21. For the reasons stated below, I find that Jefferson's due process rights were not violated because he was not compelled to appear before the jury in prison garb, and because the fact of his appearance in prison clothes caused no prejudice to him.

In *Williams*, the Supreme Court held that "the State cannot, consistently with the Fourteenth Amendment, compel an accused to stand trial before a jury while dressed in identifiable prison clothes." 425 U.S. at 512, 96 S.Ct. 1691. Such compulsion "furthers no essential state policy," *id.* at 505, 96 S.Ct. 1691, and has been widely recognized to impair "the presumption [of innocence] so basic to the adversary system," *id.* at 504, 96 S.Ct. 1691 (collecting cases). The Supreme Court made it clear, however, that the burden rests on a defendant and his counsel to object to appearing in identifiable prison clothing, explaining that a defendant may have a tactical reason for preferring to appear in prison clothes. *Id.* at 508, 96 S.Ct. 1691. The Court explicitly found that a trial judge has no obligation to inquire when a defendant appears in prison garb, because "once a defendant has the assistance of counsel[,] the vast array of trial decisions, strategic and tactical, which must be made before and during trial rests with the accused and his attorney. Any other approach would rewrite the duties of trial judges and counsel in our legal system." *Id.* at 512, 96 S.Ct. 1691. Accordingly, the Court concluded that "the failure to make an objection to the court as to being tried in [identifiable prison] clothes, for whatever reason, is sufficient to negate the presence of compulsion necessary to establish a constitutional violation." 425 U.S. at 512–13, 96 S.Ct. 1691; *see also United States v. Hen-*

*ry,* 47 F.3d 17, 22 (2d Cir.1995) (finding no compulsion where "the court did not affirmatively prevent [defendant] from wearing civilian clothing, but simply refused to" delay commencement of the trial to permit him to obtain that clothing); *Dixon v. McGinnis,* 2010 WL 3260459, at *14 (S.D.N.Y. June 9, 2010) (noting that, for "federal habeas purposes," the failure of defense counsel to object to petitioner's clothing and the absence of any indication in the record of what petitioner was wearing was "dispositive" and required denial of petitioner's due process claim (internal citation omitted)).

In this case, it is undisputed that Jefferson's criminal trial attorney did not object to Jefferson's appearance in prison clothes until the end of the first day of jury selection and that, upon hearing the objection, the trial judge ensured that Jefferson appeared in civilian clothing thereafter. Under these circumstances, the compulsion held in *Williams* to be a necessary component of a constitutional violation was absent, and the decision of the Appellate Division to reject petitioner's fair trial claim was thus neither contrary to nor an unreasonable application of Supreme Court precedent.

Jefferson's fair trial claim would fail even if he had been compelled to wear prison clothing during his trial. "Even where a defendant is compelled to wear prison clothes at trial, ... that constitutional error is subject to harmless error analysis." *United States v. Hurtado,* 47 F.3d 577, 581 (2d Cir.1995) (citing *Davidson v. Riley,* 45 F.3d 625, 631–32 (2d Cir.1995)); *see also Jones v. Lantry,* 2011 WL 5402463, at *2 (E.D.N.Y. Nov. 4, 2011) (denying a motion for a new trial in part because the defendant did not object to wearing prison clothing until the end of the first day of trial and because there was

no prejudice, as the fact of the defendant's incarceration was raised during *voir dire* ). In evaluating prejudice in the context of Section 2254 proceedings, "federal courts ... [may] overturn a state conviction only when the constitutional violation 'had a substantial and injurious effect or influence in determining the jury's verdict.'" *Wood v. Ercole,* 644 F.3d 83, 93 (2d Cir. 2011) (quoting *Brecht v. Abrahamson,* 507 U.S. 619, 637, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993)); *see also Fry v. Pliler,* 551 U.S. 112, 121–22, 127 S.Ct. 2321, 168 L.Ed.2d 16 (2007) (holding that the *Brecht* standard applies to habeas review of constitutional error in state court criminal trials, whether or not the state court recognized the error and engaged in harmless error analysis).

The Supreme Court identified the danger that concerned it in *Williams* as follows: "[t]he constant reminder of the accused's condition implicit in such distinctive, identifiable attire may affect a juror's judgment. The defendant's clothing is so likely to be a continuing influence throughout the trial that ... an unacceptable risk is presented of impermissible factors coming into play." 425 U.S. at 505, 96 S.Ct. 1691. This danger did not arise at Jefferson's trial for two reasons. First, as has been repeatedly noted, Jefferson appeared before the jury in prison garb only on the first day of jury selection, and in civilian clothes thereafter. In a case where, like here, a defendant appeared in prison garb for only one day during a trial, the Second Circuit reasoned that the "risk of prejudice to a defendant may well be less ... than when a defendant is compelled to wear prison clothes for an entire trial" (internal citations omitted). *Hurtado,* 47 F.3d at 582; *cf. United States v. Deandrade,* 600 F.3d 115, 119 (2d Cir.

2010) (holding that "a brief and fleeting comment on the defendant's incarceration during trial, without more, does not impair the presumption of innocence to such an extent that a mistrial is required"). Second, and perhaps more significantly, the fact that Jefferson was incarcerated during his trial—as well as on prior occasions—was referred to a number of times during the court proceedings, including at least three occasions when it was noted by petitioner himself. For example, and as highlighted by respondent, Jefferson answered the prosecutor's question, "And did you go home that day [the day of Jefferson's arraignment]?" by stating, "No, I did not go home, I have been locked up ever since." [11] Tr. at 383–84. This exchange was not the only time Jefferson volunteered the fact that he was incarcerated during his trial on cross-examination:

Q: So, after you testified in the grand jury you were released, but then you had to come back to court, right?

A: If I'm not mistaken, yes.

Q: Did you come back to court?

. . .

A: ... I was told to come back to Court 9:30, and I was there 9:15 and I got remanded, yes.

*Id.* at 383.

Q: When was the last time you spoke to Josie [the woman Jefferson told the grand jury he was visiting on the night of his arrest]?

A: I haven't spoken to her in a while. When you come to jail, people tend to forget about you.

*Id.* at 387. Frequent references were also made to petitioner's having been previously arrested, convicted of two felonies, and

---

**11.** It is not clear why the prosecutor engaged    in this line of questioning.

spending time in jail, often during questioning by petitioner's counsel. *See id.* at 182, 203, 348, 358, 364, 365, 390–91, 392–94, 498.

The prevalence of these references to incarceration in the trial transcript demonstrates that, even if the jurors identified Jefferson's jumpsuit as prison clothing, and even if they remembered that jumpsuit during their deliberations, petitioner would not have been prejudiced because the jurors would have known he was incarcerated by virtue of his own testimony. Further, there was ample evidence presented of Jefferson's guilt; while Jefferson's trial testimony about why he was near the housing complex on the night of his arrest was inconsistent with his testimony before the grand jury, Tr. at 386, 389–90, three police officers testified, generally consistently, about Jefferson's possession and disposal of a gun, Tr. at 21–49 (Fiore direct testimony), 160–80 (DelPrete direct testimony), 219–30 (Warshefskie direct testimony). In light of the testimony referenced above, it cannot be said that Jefferson's appearance in prison garb had a "substantial and injurious effect" on the jury's verdict. For this reason as well, the Second Department's decision that petitioner's fair trial claim lacked merit was not contrary to federal law.

## II. Ineffective Assistance Claim

Jefferson also challenges his conviction on the ground that his trial counsel's failure to object to his appearance in prison clothes constituted ineffective assistance of counsel. Specifically, he contends that the state court's rejection of his ineffective assistance claim was based on an unreasonable application of *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and on an unreasonable determination of the facts in light of the record developed during the Section 440.10 proceeding. Pet. Mem. at 25–39.

"Under *Strickland,* in order to prevail on an ineffective-assistance-of-counsel claim, a defendant must meet a two-pronged test: (1) he 'must show that counsel's performance was deficient'" and "(2) he must show that 'the deficient performance prejudiced the defense.'" *Bennett v. United States,* 663 F.3d 71, 84 (2d Cir. 2011) (quoting *Strickland,* 466 U.S. at 687, 694, 104 S.Ct. 2052). "It is the accused's 'heavy burden' to demonstrate a constitutional violation under *Strickland.*" *Moreno v. Smith,* 2010 WL 2975762, at *15 (E.D.N.Y. July 26, 2010) (quoting *United States v. Gaskin,* 364 F.3d 438, 468 (2d Cir.2004)).

When considering the first prong,

Judicial scrutiny of counsel's performance must be highly deferential ... a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."

466 U.S. at 688, 104 S.Ct. 2052 (citing *Michel v. Louisiana,* 350 U.S. 91, 101, 76 S.Ct. 158, 100 L.Ed. 83 (1955)). To determine whether deficient performance resulted in prejudice, courts ask whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. 2052. "It is not enough ... to show that the errors had some conceivable effect on the outcome" since virtually all of counsel's acts have some effect. *Id.* at 693, 104 S.Ct. 2052. Notably, "a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record sup-

port." [12] *Id.* at 696, 104 S.Ct. 2052.

Jefferson contends that his trial counsel's performance was deficient because his counsel failed to object when Jefferson appeared in a DOC jumpsuit on the first day of jury selection. As indicated above, *Strickland* requires a defendant claiming ineffective assistance of counsel to overcome the presumption that counsel's challenged action was part of a sound trial strategy. That presumption would seem to be particularly strong in this case, because the Supreme Court recognized in *Williams* that defendants sometimes decide to appear in prison clothing for tactical reasons. 425 U.S. at 508, 96 S.Ct. 1691 (noting that "it is not an uncommon de-

fense tactic to produce the defendant in jail clothes in the hope of eliciting sympathy from the jury"). Jefferson's trial counsel, however, submitted an affirmation in support of petitioner's Section 440.10 motion declaring that he "did not have Mr. Jefferson appear in his prison garb during the first day of jury selection for any strategic reason." Clarke Affirm. ¶ 4, Docket Entry 5–18 at 25.

In light of the affirmation submitted by Jefferson's trial counsel, whether petitioner has overcome the presumption that his counsel's failure to object was tactical presents a close question. I need not reach that question, however, because it was clearly reasonable for the Appellate

---

**12.** Petitioner contends that the Second Department considered his ineffective assistance claim under New York's "meaningful representation" standard, which he argues is contrary to the federal constitutional standard articulated in *Strickland.* Pet. Mem. at 28–29. At least in the context of this case, though, there is no conflict between the two measures of ineffective assistance. New York's test for ineffective assistance begins with *Strickland*'s first prong by requiring a defendant to establish that his attorney's performance fell below an objective standard of reasonableness. *Rosario v. Ercole,* 601 F.3d 118, 124 (2d Cir. 2010) (citing *People v. Turner,* 5 N.Y.3d 476, 480, 806 N.Y.S.2d 154, 840 N.E.2d 123 (2005)). However, the New York test's second prong is "more generous to defendants" than *Strickland*'s second prong, according to the New York Court of Appeals; New York's test requires a defendant to show that "the attorney's conduct constituted egregious and prejudicial error such that defendant did not receive a fair trial" and not, as required by *Strickland,* that the outcome of the trial would have been different had the error not been made. *Id.* (quoting *People v. Benevento,* 91 N.Y.2d 708, 713, 674 N.Y.S.2d 629, 697 N.E.2d 584 (1998)). The Second Circuit has concluded that, as a practical matter, New York's standard is not contrary to *Strickland,* because it is difficult to conceive of "an error so egregious that it most likely influenced the outcome of the trial, [as required by *Strickland]* but did not cripple the fundamental

fairness of the proceedings [as contemplated by New York's analysis.]" *Rosario,* 601 F.3d at 125; *accord Cornell v. Kirkpatrick,* 665 F.3d 369, 382 n. 11 (2d Cir.2011). In making this analysis, the Court explicitly disavowed the *dicta* in *Henry v. Poole,* 409 F.3d 48 (2d Cir. 2005), upon which petitioner relies. 601 F.3d at 125.

It is unclear precisely what standard the Second Department employed in evaluating petitioner's ineffective assistance claim; the opinion simply states that Jefferson was not denied effective assistance of counsel. *People v. Jefferson,* 58 A.D.3d 753, 753, 870 N.Y.S.2d 804 (2d Dep't 2009). The opinion does cite three New York cases on ineffective assistance of counsel: *People v. Turner,* 5 N.Y.3d 476, 806 N.Y.S.2d 154, 840 N.E.2d 123 (2005), *People v. Baldi,* 54 N.Y.2d 137, 444 N.Y.S.2d 893, 429 N.E.2d 400 (1981), and *People v. Marshall,* 2 A.D.3d 1157, 768 N.Y.S.2d 703 (3d Dep't 2003). *Turner* and *Baldi* discuss the standards for ineffective assistance under both the federal and state constitutions. *Marshall* employs the "meaningful representation" standard in a prison garb case, but ultimately concludes that, under *Williams,* a failure to object to a defendant's clothing does not constitute ineffective assistance. 2 A.D.3d at 1158, 768 N.Y.S.2d 703. Even assuming the Second Department applied the New York standard, however, its ruling would not, for the reasons discussed above, be contrary to *Strickland.*

Division to reject petitioner's ineffective assistance claim for failure to demonstrate prejudice. As discussed above, the trial record is replete with references to Jefferson's incarceration during and prior to trial as well as his serious criminal record. The jurors' exposure to these facts weighs heavily against the notion that Jefferson was prejudiced by wearing prison garb on the first day of jury selection. Moreover, the case against Jefferson was strong; Jefferson's credibility when asserting that he was framed by the police was weakened by the inconsistencies between his testimony before the grand jury and his trial testimony, while the officers' incriminating testimony was consistent and credible. In light of these circumstances, Jefferson has failed to establish that there is a reasonable probability that the jurors in his case would have acquitted him if they had not seen him in a DOC jumpsuit at the beginning of his trial. *See Walker v. Bennett,* 262 F.Supp.2d 25, 38 (W.D.N.Y. 2003) (denying a habeas petitioner's ineffective assistance claim in similar circumstances because the trial judge gave a curative instruction, the petitioner "expressly admitted on the stand that he had three prior criminal convictions, . . . [and because] the evidence of guilt was compelling" (internal citations omitted)). He therefore fails to carry his "heavy burden" under *Strickland,* and I accordingly recommend that his habeas claim of ineffective assistance be rejected.

## CONCLUSION

For the above reasons, I respectfully recommend that Jefferson's habeas petition be denied. Any objections to the recommendations made in this Report must be submitted within fourteen days after filing of the Report and, in any event, no later than May 27, 2013. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. Proc. 72(b)(2). Failure to file timely objections may waive the right to appeal the District Court's order. *See Small v. Sec'y of Health & Human Servs.,* 892 F.2d 15, 16 (2d Cir. 1989) (discussing waiver under the former ten-day limit).

Brooklyn, New York, May 8, 2013.